DAWSON's APPEAL (*In Re* the Last Will and Testament of JULIANA PAGE, deceased).

*Nuncupative will* — Rogatio Testium.

The statutory provision (R. S. ch. 97, § 6), that no nuncupative will shall be good, where the estate bequeathed exceeds $150 in value, unless the testator, at the time of pronouncing it, "did bid the persons present, or some of them, to bear witness *that such was his will, or to that effect,*" *held* not to be satisfied by a request of the alleged testatrix to one person "to witness what she said," and to another "to come back and pay attention to what she said."

Dawson's Appeal.

APPEAL from the Circuit Court of *Racine* County.*

On the 8th of October, 1866, *Melissa Throup*, of the city of Racine, presented to the county court of said county, a petition which stated that Juliana Page, late of said city and county, had deceased in said city on the 11th of September of that year, having previously made her last will and testament nuncupative; that the petitioner was named executrix therein; that the deceased was at the time of her death an inhabitant of said city, and that said will and testament related to personal property; that (as the petitioner was informed and believed) said deceased had no heirs or next of kin in the United States; that the goods and chattels of the deceased in said county amounted to some $300, and those in the kingdom of Great Britain to $30,000, and that she left debts due and unpaid to an amount unknown to the petitioner. The petition was accompanied by a statement which set forth said nuncupative will as follows: "After the payment of all my debts and funeral expenses, I give unto *Melissa Throup*, wife of Martin Throup, of the said city of Racine, the residue of my estate, consisting of my clothing and per-

---

* The very interesting character of the questions raised in this case appears to justify a fullness of statement not usually allowed in these reports. The following is the statutory provision in respect to nuncupative wills (R. S. ch. 97, § 6):

"No nuncupative will shall be good, when the estate bequeathed shall exceed the value of $150, that is not proved by the oath of three witnesses, at least, that were present at the making thereof; nor unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, to bear witness that such was his will, or to that effect; nor unless such nuncupative will were made at the time of the last sickness of the deceased, and in the house of his or her habitation or dwelling, or where he or she had been resident, for the space of ten days or more next before the making of such will, except where such person was unexpectedly taken sick, being from home, and died before he or she returned to the place of his or her habitation."

sonal effects now being in the state of Wisconsin; and all my personal estate in England, in the kingdom of Great Britain, whether consisting of money, stocks and securities of every name or nature whatever, and do make her my executrix." "These words, or words of like effect," it is added, " the said deceased declared in the presence of the witnesses whose names are hereunto attached, with the intention that the same should stand for and be her last will and testament, and she, the said Juliana Page, bid the undersigned witnesses bear witness thereto." (Signed by Kittie Rohan, Maryette Lender, and Richard Lender.) — *Henry Dawson*, the father of the deceased, appeared in the county court and resisted the application. The evidence as to the alleged testamentary words, and the circumstances under which they were uttered, was substantially as follows :

Richard Lender, a brother of *Mrs. Throup*, testified : "I had just got through eating a late dinner and was reading my paper, when Mrs. Page sent for me to come over there (to the residence of Martin Throup). I went over, and went up to her room; she was sitting on the edge of the bed when I went in. I asked her what she wanted of me; she said she wished to talk with me; she said she wanted what was set forth in a deed she signed, also her personal property, to be left to *Mrs. Throup*, after her indebtedness was paid out of it. This was not far from two o'clock; my wife was in the room, and Miss Rohan. This was about all she said; she said *Mrs. Throup* had had a great deal of trouble with her, and that she had not got enough to pay her for her trouble; there was nothing particularly said to any one else except myself; she directed her conversation to me, except at one time, and then to my wife, and said, 'Mrs. Lender knows what a trouble I have been,' and that she had been a very near friend to her through her trouble; this was all that was said. *Mrs. Throup* stood in the door. Mrs. Page was in sound mind as usual at this time—I think

more so.  She was highly educated.  I remained there probably an hour and a half before I left the house; I think she thought she was going to die; she died that same evening." *Cross-examination:* "I was in the room about one-half an hour; may not have been so long; was at the house about one and a half hours; did not go into the room after I went out; she sat up all the time while talking with me.  Do not know how long she had been sick; was over the Sunday before she died; she was feeling rather poorly.  She was in the habit of taking a good deal of stimulus; said she could not get along without it; took brandy and morphine; I do not know how much she would consume; she drank considerable; I do not know that she took any during her last sickness; am pretty certain she took none while I was in the room; she had to have some stimulants to keep about; she kept her room pretty close — was generally there."

Maryette Lender, wife of Richard Lender, testified: "I was present at the conversation testified to by my husband.  Mrs. Page was sitting upon the side of the bed.  She stated to my husband that she wished the amount set forth in a deed, and her personal property, after her indebtedness was paid, to go to *Mrs. Throup.*  I was sitting at the side of the bed; Mr. Lender was on the other side; *Mrs. Throup* was near the door in the room.  Mrs. Page was clear in mind as usual; all attention was paid to her, of course; she had requested. Mr. Lender to be sent for; she told how much trouble she had been to *Mrs. Throup,* and that she did not know that all she had would pay her; she had been her only friend for many years.  This was the last day of her sickness; I was there when she died; *she called us all to witness what she said;* I remained with her all the time to her death; I rather think she was conscious at the time that her end was approaching; I do not think she expected to die so soon, but I think she expected to before morning.  She was a highly educated woman."

*Cross-examination:* "I went there that day about nine or ten in the morning; this conversation was about two o'clock. She said she wanted to talk with Mr. Lender; she said the amount set forth in a deed, and her personal property after her debts were paid, she wanted to go to *Mrs. Throup;* this was all she said concerning that business; she did not talk particularly on any other subject; nothing said by any one else; she did not say any thing about approaching death; she said she was in such misery — "Oh, let me go!" This was afterward. I think she began to fail about three o'clock; after that I think she remained in the same state for an hour or so—I can't say exactly. I had known her some three or three and a half years; she took stimulants—morphine and brandy; took them in her ordinary health at all times; during that day I do not know that she took any morphine, but I saw her take some brandy; I think she took it four or five times; did not help herself to it; did not at any time leave the bed and help herself to the brandy; she walked around the room until twelve or one o'clock. She said she wanted to talk to Mr. Lender, when she sent for him; she talked of a will ever since I knew her; nothing was said to her by any one before he came. *Mrs. Throup* is not a relative of hers that I know of; her parents live in England, I believe, as I have heard her talk of it."

Kate Rohan testified: "I live at Mr. Throup's, in Racine; knew Mrs. Page very well; was present the day she died; heard the conversation testified to by Mr. Lender; I was just going out of the room, and *she asked me if I would not come back and pay attention to what she said*; she said she wished *Mrs. Throup* to have the money mentioned in the deed, and also to have her personal property that was at *Mrs. Throup's.* This was a little after two o'clock; she sat on the side of the bed; I think she was perfectly sane; she acted as if she knew every thing while I was there; she conversed just as she always did; she was very highly educated, what I knew of

her; she asked me several times if I thought she was going to die; I said I did not know; I had seen her as sick several times before. She had resided at *Mrs. Throup's* during the period that I was there." *Cross-examination:* "I do not know what Mr. and Mrs. Lender testified to, here to-day, before the court. I was in the room about half an hour when we had this conversation; she talked quite freely at this time, but later she did not talk as free; they were not doing any thing, that I saw; I stayed until they got through talking, and then I put some wood in and went down; I think it took her about a quarter of an hour to make this statement — perhaps longer; she could not talk very fast; she asked me several times if I thought she would die; I said, 'No;' she did not think she was going to die; she asked me once about noon; she said, just before she died, 'Katie, I am going to die;' she died about half past seven o'clock."

Dr. John Thompson, examined at the instance of the county judge, testified that he had been Mrs. Page's confidential physician for six years before her death; that she died of disease of the stomach, under which she had been suffering for years, produced by the habitual use of brandy and morphine; that her last sickness commenced three or four weeks before she died — that is, the difficulty of her stomach grew worse from that time; that he saw her on the morning of Monday, September 10th; she was complaining of pain, and could keep nothing on her stomach; her pulse had been growing weaker and quicker for some three or four weeks; in the middle of the day she could retain some food upon her stomach much better than at any other time of the day. "I saw her again about four or five o'clock P. M.; she had spasms of the stomach and severe pains, and vomited; she retained not much upon her stomach at this time; she seemed to be in great pain; I remained this time about an hour. I saw her in the evening again, early in the evening, and remained there until about nine o'clock P. M.,

I think; when I left I had succeeded in part in allaying the spasmodic action of the stomach, though not entirely; she was growing weaker during the day, and pulse more feeble; no other particular change. I next saw her Tuesday morning, about eight o'clock; found her weaker and pulse quicker, and unable to retain any thing upon her stomach for any length of time. I saw her again just before noon on Tuesday; found that she had failed a good deal from the morning; her pulse was weaker and quicker; she had failed; I said to *Mrs. Throup* I did not think she would live at least twenty-four hours; I think there was a gangrenous state of stomach, from what she threw out. I saw her again about half-past five; found she had failed very materially; her pulse was gone at the wrist, pretty much; could feel it about the neck some; she was still retching at the stomach; had an intense thirst, but threw out everything put into her mouth; she threw out morphine again. I went again in the evening, and she was dead; died, I heard, a little after seven o'clock. I think the disease took an acute form during its last stages; I was pretty well satisfied Tuesday morning that she would die." *Cross-examination:* "I think the first time I saw her was in 1860; she had been vomiting, and did not retain much of anything upon her stomach; was sick a long time, and I attended on her; had frequent attacks of this kind after I knew her, but not so severe. I do not recollect that I ever saw her write, but have received notes written by her; she was a fine penman; was an educated woman, I think; I do not know but she might have been able to write her name Tuesday forenoon, but I can't tell. I hardly think she was able to walk Tuesday forenoon, unless from unnatural spasmodic action; she sat up Tuesday noon on forepart of bed; I did not see her sitting in any other part of the room that day; on reflection, I think she sat in a rocking chair just in front of the bed. Dr. Wilson talked to her Tuesday evening; she said she knew him; I think her

mind was right at that time, from what I saw, but she said very little; by rousing her she would answer questions."

Dr. Wilson testified: "I saw Mrs. Page September 11th, the day she died; Dr. Thompson requested me to go and see her between four and five o'clock P. M.; found her very much exhausted, and in a good deal of pain; was throwing herself; was partly raised up, two women holding her; immediately upon seeing her I made up my mind she was near her end. I spoke to her—asked her if she recognized me; she said 'Dr. Wilson,' but made no further observation that I could understand; I thought she muttered something, but could not tell what; I should judge she was very slightly conscious, but not sufficiently so to express a clear idea."

At a subsequent hearing before the county court, the witnesses were allowed, against the appellant's objection, to be further examined, and testified as follows:

Richard Lender: "She stated at that time, there in the room, that the amount in the deed was £5,951, that she wished *Mrs. Throup* to have; she said it was back where she came from in the old country; she made no further reference to the deed; she said, the deed that she signed."
*Cross-examination:* "She says to me, the amount of the deed that she signed she wished to go to *Mrs. Throup;* the amount in that deed was £5,951; that is her exact language as near as I can recollect it. I never expected it would come up in this shape. She said this when she was nearly through with her statements. I had heard her speak of the amount in the deed a hundred times before. I am sure that she said it at this time. It is my impression that she said it was a deed that Major Paine acknowledged; but I am not positive about this."

Mrs. Maryette Lender: "She bequeathed all her personal property, and the amount set forth in the deed, which was £5,951; she said, the deed that Major Paine acknowledged."

*Cross-examination :* "I do not now remember that she said 'bequeathed,' but that is what I suppose she meant; she referred to Major Paine as having acknowledged the deed." *Re-direct :* "I think, perhaps, she used the word 'bequeathed,' but am not positive."

Katie Rohan: "I do not remember very much, but I remember that she said that she wished *Mrs. Throup* to have what was in that deed; but I do not remember how she said it; I mean, I cannot use her precise language; I don't know what deed she meant, but I heard Mr. Paine's name mentioned in connection with the deed; I heard her mention the amount in the deed, when I was in the room; I remember it, because it was a good deal to have; she said it was £5,951." *Cross-examination :* "She said, she wanted *Mrs. Throup* to have all her personal property, and the amount that is in that deed, she said, after her debts were paid; she said, the amount was £5,951; I can't remember anything more she said; I happened to hear Mr. Paine's name mentioned by Mrs. Page; I am sure his name was mentioned; I don't know that his name was mentioned in connection with the deed." *Re-direct :* "I heard his name mentioned, and the deed, but I don't know that it was in connection with the deed; I heard his name mentioned at the time they were talking about the deed."

The county court made an order allowing said nuncupative will, in the following form: "I wish *Mrs. Throup* (meaning *Mrs. Melissa Throup*, of the city of Racine, and wife of Martin Throup, of said city), to have all my personal property in her (meaning *Mrs. Throup's*) house, and also five thousand nine hundred and fifty-one pounds, mentioned in a deed which I signed and acknowledged before Major Paine (meaning Ira C. Paine, Esq., of said city of Racine),—the five thousand nine hundred and fifty-one pounds being in England."

*Henry Dawson* appealed from this decision; and by stipulation the appeal was tried upon a certified copy of the record in

the county court, containing the testimony.   The circuit court found the following facts:

"1.  That Juliana Page, on the 11th day of September, A. D. 1866, died at the residence of S. M. Throup, in the city of Racine, in the county of Racine, and state of Wisconsin, which was the home of her habitation, where she had been resident for the space of more than ten days next before said date.   2.  That on said day, said Juliana Page, at the place of her said residence, spoke these words, in substance, 'I wish *Mrs. Throup* (meaning *Melissa Throup*, wife of Martin Throup), to have the amount mentioned in a deed, being £5,951, and all my personal property after my debts are paid,' and that said words were so spoken, in substance, by the said Juliana Page, in her last sickness, to wit, while *in extremis*.   3.  That the said Juliana Page then and there intended, by speaking said words, to make her will nuncupative, and bequeath thereby, to the said *Melissa Throup*, the property in those words mentioned by her.   4. That said words were spoken as aforesaid, by the said Juliana Page in the presence of three witnesses, who were present at the speaking thereof, and that said Juliana Page, at the time of pronouncing the same, did bid the persons present, or some of them, to wit; two of them, bear witness to the effect that such words were her will.   5.  That at the time of the speaking of said words as aforesaid, the said Juliana Page was of full age and sound mind, memory and understanding."

On these facts the court held, that said deceased, at the time and place aforesaid, made a valid nuncupative will in the words above stated, which was entitled to probate.   Judgment accordingly ; and *Henry Dawson* appealed.

The following extracts contain the essential parts of the opinion prepared in this case by the Hon. Wm. P. Lyon, the judge of the circuit court:

"I am of the opinion that it is proved, by the oath of three witnesses who were present when the words were spoken, that,

on the 11th day of September, 1866, the deceased spoke these words, in substance: ' I wish *Mrs. Throup* (meaning *Melissa Throup*, wife of Martin Throup) to have the amount mentioned in a deed, being £5,951, and all of my personal property, after my debts are paid.' Did the deceased, when she spoke these words, intend thereby to make a testamentary disposition of the property mentioned by her?

"It is argued by counsel for appellant, that the words used do not imply any such intent—that they refer to a *future* disposition of the property, and are such as would have been used by her had she been giving directions for a written will. On the other hand, counsel for respondent contends that the words are such as a person would naturally use under the circumstances, who intended a testamentary disposition. It seems to me that no inference can safely be drawn from the mere form of words used, either in favor of or against the theory of an intent to make a testamentary disposition of the property. We must examine the surrounding circumstances, and ascertain whether they cast any light upon the question, pausing only to remark, that had the deceased executed in due form of law a written will in the language which we have found she used on that occasion, there can be no question but that it would have been a valid will, under which *Mrs. Throup* could have held the property. What, then, were the circumstances under which these words were spoken? It appears that the deceased had been for several years addicted to the inordinate use of stimulants, which had destroyed the healthy action of the stomach and subjected her to frequent attacks of violent illness. Three or four weeks before her death, the difficulty in her stomach grew worse, and did not yield to medical treatment. On Monday, September 10th, her physician, Dr. Thompson, visited her three times, and was with her all the evening. She vomited, was in great pain, had spasms of the stomach, and was able to retain but little food. Her pulse

grew more feeble, and she was weaker during the day. The doctor saw her again the next morning, at eight o'clock (September 11th). · She was weaker and her pulse quicker than when he left her the night before, and she could retain nothing on her stomach for any length of time—not more than five minutes. He saw her again just before noon, and found that she had failed a good deal from the morning; the retching continued; there was a gangrenous state of the stomach; could retain nothing on her stomach; told *Mrs. Throup* that he thought she could not live twenty-four hours; her pulse was weaker and quicker. This was her condition at noon of September 11th. The alleged testamentary words were spoken about two o'clock, P. M.; at three, P. M., she began to fail more perceptibly; at five her pulse was gone at the wrist, and she was evidently near her end; and between seven and eight o'clock of the same evening she died. So much for her condition when the words were spoken. As to her relations with her family in England, or even with *Mrs. Throup*, the evidence gives us but little information, but it does appear that she regarded *Mrs. T.* as her benefactress, and speaks of her as a very near friend, and as her only friend. The latter remark would seem to imply that she was estranged from her family. It is not very remarkable, then, that she should desire to make a provision for *Mrs. T.*, even to the exclusion of her relatives. She had a legal right so to do, if she chose.

"But it is asked why, if she wished to make such provision, did she not have her will reduced to writing, inasmuch as she had ample time? This is a difficult question to answer, because we cannot fully know the feelings and emotions which control the actions of the dying. She was in great bodily pain; death was very near; indeed a vital organ, the stomach, had ceased its functions — had mortified, and was dead already. Bodily strength was rapidly failing; her pulse was growing weaker and quicker. She was a woman of intellect and cul-

ture; she knew that these symptoms indicated speedy death, and she may have feared that memory or speech, or even life, might fail before a written will could be prepared. It is true, had there been a competent person present to do it, there was time to have reduced her wishes to writing, and for her to have executed it. This necessarily required but a few minutes of time; but did she comprehend how simple a process it would have been? Some consideration is surely due to the fact that in her native country the making and execution of a will is a ponderous transaction — one from which a dying person might well recoil; and it is fair to presume that she believed there was neither time nor strength left her sufficient for the task.

"I find no evidence tending to show that after she sent for Mr. Lender, she contemplated making a written will; and the fact that she called witnesses to hear what she said, and to take notice thereof, is a strong circumstance to prove the *animus testandi*. Upon the whole, I think that it appears from the evidence, that the deceased spoke the words in question with the intention thereby to make a testamentary disposition of her property.

"2. At the time of pronouncing such will, did the deceased bid the persons present, or some of them, bear witness that such was her will, or to that effect?

"The testimony of Richard Lender is, that the deceased prefaced the speaking of the testamentary words by saying that she wished to talk with him. Mrs. Lender, speaking of the same words, says, the deceased "called us all to witness what she said." And Katie Rohan testifies that, being about to leave the room, deceased called her back, and "asked her to pay attention to what she said," and thereupon spoke the testamentary words. This is all the evidence on the subject—each witness testifying to a separate and distinct act, and no two of them testifying to the same *rogatio testium*.

"It is claimed by counsel for appellant, that it is necessary
Vol. XXIII. — 6

that the testator should bid three persons to bear witness, etc., or the will is void. The language of the statute is, that "he shall bid the persons present, *or some of them*, to bear witness," etc. I think the requirement of the statute is complied with if two be bid to bear witness, etc. This is the construction adopted in *Yarnall's Case*, 4 Rawle, 63, and is doubtless legally, as it certainly is grammatically, correct. Here Mrs. Lender and Katie Rohan were so called upon, if not Mr. Lender; and this is sufficient.

"But a more difficult question is, whether it is essential to the validity of the will that the fact that at least two of the persons present were bid to bear witness, etc., be proved by three witnesses. If so, then this alleged will must be held invalid, because there are but two witnesses to such *rogatio testium.* It becomes important, therefore, to ascertain what is the rule of evidence in this particular. Are three witnesses essential to prove the *rogatio testium?* Or may it be proved, like other facts in a court of justice, by a less number of witnesses? It must be borne in mind, that the statute requires, in the first place, that the will must be proved by the oath of three witnesses, at least. It then proceeds to enact that the will shall not be valid, unless, first, the *rogatio testium* be proved; second, unless the will was made at the time of the last sickness of the deceased; and third, in the house of his habitation or dwelling, or where he had been resident for ten days—except the deceased was unexpectedly taken sick from home, and died before he could reach there, etc. I think it will not be claimed that the fact that the will was made in the time of the last sickness of the deceased, or that it was made in the house of his habitation, or that, if made away from home, the deceased was unexpectedly taken sick and died before reaching his habitation, must be proved by the oath of three witnesses before the will can be held valid; and yet there seems to be as good reason for requiring such proof of these facts, as of the fact that there

was a *rogatio. testium.* I think that, had the legislature intended to require three witnesses to prove the *rogatio testium*, it would have enacted that such will should not be valid 'unless it be also proved *in like manner*' (or, 'by the oath of three witnesses,' or by the use of some other apt and proper words to show such intention) 'that the testator did bid the persons present, or some of them, to bear witness,' etc. So I think a proper construction of the statute permits this fact to be proved by less than three witnesses.

"I am aware that *Yarnall's Case*, above cited (4 Rawle, 63), holds a different doctrine, and, if followed in this case, would defeat the alleged will of Mrs. Page. But I decline to follow that decision, for these reasons: first, the question was not argued by counsel; second, no authority is cited by the court, and there is no evidence that the question was carefully considered; third, the decision of the question did not control the decision. of the case, which was mainly decided upon other grounds; fourth, it violates, in my opinion, the well-settled rules of statutory construction. I am of the opinion, therefore, that the *rogatio testium* is proved.

"3. Was such will made by the deceased at the time of her last sickness, to wit, when she was *in extremis?*

"I think that it was so made. I have before spoken of the condition of the deceased when it was pronounced. The evidence leaves no reasonable doubt upon my mind, that when she made this will, the hand of death was pressing heavily upon her, and that she was fully aware of her condition. If she was not *in extremis*, then that state is only reached with the last throe of mortal agony. The term has no such restricted signification. When disease has nearly finished its work, when the weakened pulses throb faintly and irregularly, when the functions of some of the vital parts cease, and the impress of speedy dissolution is upon the brow of the sufferer — then is he *in extremis*, although a remnant of life may remain to him

for hours. And this was the condition of Mrs. Page when she made this testament. It was evident to the practiced eye of Dr. Thompson, before noon, that she was dying; and at 3 o'clock, P. M., the same fact was apparent to all. So she was dying, and within six hours of her death, when she made her will. No case goes so far as to hold that a person in such condition is not *in extremis*.

"But some of the cases hold, that, if there is time to make a written will, a nuncupative will shall not be allowed. No case has been cited, where it was necessary to the decision of it to enunciate this principle; and it is, therefore, *obiter dictum*.

"In *Prince* v. *Hazleton*, 20 Johns. 513; in *Yarnall's Case*, 4 Rawle, 63, and in *Boyer* v. *Frick*, 4 Watts and Serg. 361, the decisions were made on the ground that the testators were not *in extremis* when the wills were made; and clearly they were not. In *Porter's Appeal*, 10 Barr, 250, it was held that there was no *animus testandi;* but that the deceased intended a written will. What necessity, therefore, for the court to say, that a man on his death bed, writhing in bodily anguish, and who died within an hour after he spoke the alleged testamentary words, had abundant time in which to make a written will? I have not time to discuss the subject more fully. These *dicta* do such violence to the clear and plain provisions of our statute, that I am convinced they should not be regarded as authority.

"The law says, that a man may make a nuncupative will, under certain circumstances and conditions, one of which is, that it be made " at the time of his last sickness;" but these authorities, or decisions rather, hold that he shall only make such will in the very last extremity of his last sickness, and then, if it turns out that he lives and retains his senses a sufficient time after making such will to have made a written one, it shall be void. It will be soon enough for this court to sanction this judicial legislation when the supreme court of this state shall take the initiative."

*Fuller & Dyer* and *C. W. Bennett*, for appellant, contended that nuncupation can only be resorted to *in extremis*, to wit, when there is no time or opportunity to make a written will; citing Perkins, § 476; Swinburne, 327; Bacon's Abr. by Guillim, 305; 2 Blacks. 500; *Prince v. Hazleton*, 20 Johns. 501; *Dockum v. Robinson*, 6 Foster, 384; *Yarnall v. Yarnall*, 4 Rawle, 63; *Boyer v. Frick*, 4 Watts & S. 357; *Porter's Appeal*, 10 Penn. St. 254; *Haus v. Palmer*, 21 id. 296; *Swift's System*, 420; *Reese v. Hawthorn*, 10 Grat. 548; *Bronson v. Burnett*, 1 Chand. 136. From the testimony in this case, they contended that Mrs. Page clearly had abundance of time and opportunity to make a written will, not only after her last sickness began, but after she sent for Mr. Lender. 2. There is no sufficient proof of the *animus testandi*, i. e., of an intent then and there, by the act done, to make a testamentary disposition of the property. *Porter's Appeal*, *Yarnall's Case*, *Dockum v. Robinson* and *Reese v. Hawthorn*, above cited; *Winn v. Bob*, 3 Leigh, 140; *Gibson v. Gibson*, Walker, 364; *Dorsey v. Sheppard*, 12 Gill & J. 192. 3. There was no sufficient *rogatio testium*. The language of the statute (§ 6, ch. 97, R. S.) means that the testator must then and there communicate to the witnesses his intent to make a disposition of his property by nuncupation, and that what he is then doing is such act of intentional nuncupation. This requirement is equivalent to that made in some states as to the *publication* or declaration of *written* wills. 2 N. Y. R. S. 63, § 40, subd. 3; Dayton's Surrogate, 81; *Torry v. Bowen*, 15 Barb. 304; *Remsen v. Brinckerhoff*, 26 Wend. 325; *Ex parte Beers*, 2 Bradf. 164; *Lewis v. Lewis*, 11 N. Y. 220; *Rutherford v. Rutherford*, 1 Denio, 33; *Chaffee v. Baptist Miss. Conv.*, 10 Paige, 85; *Coffin v. Coffin*, 23 N. Y. 9; *Seymour v. Van Wyck*, 6 id. 120. Counsel further argued at length, that the statute must be understood as requiring proof *by three witnesses* at least, that the testator bid the persons present, or some of them, to

bear witness, etc. The legal thing called a will is made up of at least three things: (1.) The intent to make the bequests. (2.) The words embodying the intent, and declaring the bequests. (3.) *The publication.* Given the intent, and the spoken words, and lacking the *rogatio testium*, and there is no will. But the will must be made in the presence of three witnesses at least. Therefore all the essential parts must be so made, including the publication. To this point, and to the doctrine that the statute will be construed most strictly, the following cases were cited: *Bennett v. Jackson*, 2 Phil. 190; *Parsons v. Miller*, id. 194; *Yarnall's Case, Winn v. Bob* and *Haus v. Palmer*, above cited; *Woods v. Ridley*, 27 Miss. (5 Cush.) 119; *Weeden v. Bartlett*, 6 Munf. 123. Counsel distinguished *Parsons v. Parsons*, 2 Greenl. 298; and as to *Parkinson v. Parkinson*, 12 S. & M. 673, and *Burch v. Stovall*, 27 Miss. 725, stated that they were under a different statute from ours.

*Paine & Millet*, with *Byron Paine*, of counsel, for the respondent, argued that conceding that the courts have so far succeeded in legislating upon this subject as to have added to the statute the restriction that a nuncupative will shall be made, not only in the last sickness, but also when the party is *in extremis*, still they have not established the proposition that he is not to be considered *in extremis* except when it has become absolutely impossible to make a written will. No case can be found where the will was in other respects properly executed, that has held it invalid upon that ground. The cases are entirely in harmony with the rule to be drawn from Chancellor KENTS's opinion in *Prince v. Hazelton*, 20 Johns. on p. 513, that a person speaking testamentary words under the apprehension of approaching death, and actually dying the day afterward, was to be regarded *in extremis. Parsons v. Parsons*, 2 Greenl. 298; *Sampson v. Browning*, 22 Ga. 293; *Yarnall's Case*, 4 Rawle, and *Boyer v. Frick*, 4 Watts & S.,

were clearly cases where the party was not *in extremis*, even with a liberal and reasonable interpretation of that phrase; and the general language there used about the possibility of having made a written will must be considered as applicable only to that state of facts. In *Porter's Appeal*, 10 Penn. St. 250, the court held, that directions for a written will, which were not executed, could not be established as a nuncupative will; and the *dictum* that the party was not *in extremis*, though in great agony- at the time of speaking the words, and dying an hour afterward, does violence, as the circuit judge remarks, not only to the statute but to common sense. 2. Counsel argued from the words of the statute, that it was not necessary either that three persons should be called upon by the party making such a will to bear witness to his words, or that the fact of such *rogatio testium* should be proven by three persons. In respect to written wills, it was once strenuously contended, that, inasmuch as the statute had prescribed a certain number of witnesses for such wills, all the essential requisites of the will must be proved by the whole number of witnesses. But the rule has been established otherwise, and it is sufficient if the essential facts are proved by one witness, even against the testimony of the other. *Auburn Seminary v. Calhoun*, 25 N. Y. 422; *Welch v. Welch*, 9 Rich. Law, 133; *Crusoe v. Butler*, 36 Miss. 150. It seems, also, that the ecclesiastical courts hold, that proof of rogation by one witness is sufficient. See the statement of the court in *Baker v. Dodson*, 4 Humph. 342, at the close of the opinion. 3. The requests made by Mrs. Page to the several witnesses in this case were a sufficient rogation. It is settled that it is not necessary to use the language of the statute, nor even language strictly equivalent to that of the statute, and that no particular form is necessary, but that it is sufficient that such language is used, that, in connection with surrounding circumstances, the witness understands that he is called on to pay attention to

the testamentary disposition of the effects of the dying person. *Arnett v. Arnett*, 27 Ill. 247; *Yarnall's Case; Parsons v. Parsons*, and *Baker v. Dodson*, *supra; Gwin v. Wright*, 8 Humph. 639; *Burch v. Stovall*, 27 Miss. 725, 729.

DIXON, C. J.   The alleged will cannot be sustained.   One most important requisite of the statute is wholly unproved, and we shall consider no other of the numerous questions so ably discussed by counsel.   We refer to the *rogatio testium* clause, as it is called, which declares that no nuncupative will shall be good, when the estate bequeathed shall exceed the value of one hundred and fifty dollars, " unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, to bear witness that *such was his will, or to that effect.*"   There is no proof whatever that the alleged testatrix requested the persons present, or any of them, to bear witness that such was her will, or any thing to that effect. One witness testifies : " She called us all to witness what she said ; " another, " She asked me if I would not come back and pay attention to what she said."   This is all the testimony which in any way directly touches the point.   The fact that Mrs. Page intended to make a will, and supposed that she was doing so, and that the persons present so understood her, is all a mere matter of inference to be derived from the other facts given in evidence, namely, that she stated to those around her how she wished her property disposed of, and called their attention to what she said.   This is obviously not what the statute requires.   Its language is too plain and unequivocal to admit of doubt or evasion.   It is not that the testator shall bid the bystanders to bear witness to what he says about the disposition he wishes to have made of his property, but that what he so says is his will, or to that effect.   The statute seems to have been most carefully and studiously framed with a view to excluding the inference or presumption which would otherwise

very naturally arise from the substantive words of the will itself, that a testamentary disposition of the property was intended. To establish the *aniums testandi*, or teatamentary purpose of the deceased, something more must be shown than the words of the will, and that the attention of the witnesses was called to them. A declaration of the testator that such was his will, or some other unequivocal act or fact of equal import, showing that an actual testamentary disposition of the property was intended, must be proved. This, it seems to us, under any the most favorable construction of the statute so as to give effect to the design of the testator, is the least that can be required. The reason of this requirement is well stated in some of the cases cited by counsel for the respondent. The legislature knew, as all persons of experience know, the inclination of most people, when in a dying condition, to declare to those about them the disposition they wish made of their property, and to request them to remember or bear witness to their wishes, and to aid in carrying them out. Such declarations are often made by persons having no present intention of making a will. It was to distinguish between such casual conversations by one in his illness as to his wishes on the subject of his property, and a valid nuncupation, and to guard against the former being imposed upon the court as testamentary, that this provision was inserted. The legislature deemed it unsafe to trust to any mere inference arising from the words of the supposed will as to the intention to nuncupate; and to uphold the alleged will in this case would, in our judgment, be to dispense with this requirement entirely, which of course we have no right to do.

It hardly seems necessary for us to go through or comment upon the cases cited by counsel for respondent. It is enough to say that they are all clearly distinguishable from this case. In every one of them there was some extrinsic fact or circumstance, tending to show the *animus testandi*, which does not

appear here. *Arnett v. Arnett*, 27 Ill. 247, fully sustains the views we have taken. In *Baker v. Dodson*, 4 Humph. 342, the testator exclaimed, " I am gone — I am lost " — and, after a few moments of silence, addressed himself to the witnesses, saying : " I wish to make a disposition of my effects," and then proceeded to dispose of his effects. In *Gwin v. Wright*, 8 Humph. 639, the testator was informed by the witnesses that he must soon die, and asked by them " if he wished to make any disposition of his property," and both witnesses " understood at the time that he was making his will." In *Burch v. Stovall*, 27 Miss. 725, the testatrix had expected to make a written will, and employed a person to write it for her, but being apprehensive that she would not survive until the time appointed for him to return with it, made the nuncupative will in its stead, declaring that " she willed " so and so. And in *Parsons v. Parsons*, 2 Greenl. 298, the testimony was, that the deceased, being asked, on the morning before his death, who he intended should have his property, replied that his wife should ; that his father, who was the heir at law, being present, thereupon observed that he did not wish for a cent of his son's property, but desired that it might go to the wife, and spoke of it both then and on another occasion as a matter well understood and agreed upon. The father afterward contested the will, and the court tried the case somewhat as if the element of estoppel entered into the consideration of it. But in all of these cases there were declarations of the deceased, and circumstances outside the language of the will, tending more or less strongly to show the intention to make a will. In the case at bar there were no such declarations or circumstances — only the facts that Mrs. Page sent for one of the witnesses to come and see her, and said " she wished to talk with him," and requested the other two witnesses to pay attention to what she said. It may be admitted that these facts, together with the declarations of the deceased constituting the alleged will, raise

a strong probability that an actual testamentary disposition of the property was intended; but, as already said, they do not, in our judgment, satisfy the requirement of the statute.

For these reasons the judgment of the circuit court must be reversed, and the cause remanded for further proceedings according to law.

*By the Court.* — Ordered accordingly.